# In the United States Court of Federal Claims

No. 22-659
Filed: September 27, 2022
Re-issued: October 18, 2022[1]

_____

|  |  |
|---|---|
| HOMELAND SECURITY SOLUTIONS, INC., | ) |
|  | ) |
| *Plaintiff,* | ) |
|  | ) |
| v. | ) |
|  | ) |
| THE UNITED STATES, | ) |
|  | ) |
| *Defendant.* | ) |
| _____ | ) |

*Shomari B. Wade*, Greenberg Traurig, LLP, Washington, D.C., for Plaintiff.  *Michael J. Gardner*, *Timothy M. McLister*, and *Christopher M. O'Brien*, *of counsel*.

*Sean K. Griffin*, Trial Attorney, United States Department of Justice, Civil Division, Washington, D.C., with whom was *Douglas K. Mickle,* Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, for Defendant.  *Amanda Belanger*, Associate Counsel, Office of Counsel for the Commandant, United States Marine Corps, *of counsel*.

## OPINION AND ORDER

**MEYERS, Judge**.

        In this pre-award bid protest, Homeland Security Solutions, Inc. ("HSSI"), a long-term incumbent contractor, challenges the Marine Corps' decision to procure a follow-on contract as a set-aside for service-disabled veteran owned small businesses, which excludes HSSI from competing for the follow-on contract.  The regulatory framework governing set-asides for small businesses imposes a purposely low threshold, and the Marine Corps met these minimum requirements to lawfully set aside the challenged procurement.  Therefore, the Court denies HSSI's motion for judgment on the administrative record, motion to complete the administrative record, and for permanent injunctive relief.  And the grants the United States' cross-motion for judgment on the administrative record.

_____

[1] The Court initially filed this opinion under seal to allow the Parties to propose redactions. The Court has incorporated the proposed redactions and makes them with bracketed ellipses ("[ . . . ]") below.

I.      **Background**

        A.      **The Marine Corps Civilian Law Enforcement Program**

In the 2000's, the U.S. Marine Corps ("USMC") launched the Marine Corps Civilian Law Enforcement Program ("MCLEP"), which "provides oversight, establishes policy and doctrine requirements and manages manpower resources for civilian and military personnel in support of Marine Corps Law Enforcement." AR 150. "MCLEP's primary mission requirement is to centrally-manage civilian hiring, provide entry level training and initial uniform and equipment issue for law enforcement and security personnel to various locations." *Id.*

Since 2009, the USMC has contracted with HSSI to support MCLEP. AR 212-13. Through a series of contracts HSSI is the only contractor that has supported MCLEP, although the scope of these contracts has decreased over the years. AR 212-13. The current MCLEP contract is set to expire in March 2023. AR 213.

        B.      **The procurement**

The USMC conducted market research for MCLEP requirements in 2016 when procuring a predecessor contract. AR 139. As part of this research, the USMC hosted an industry day and requested capability statements from interested parties. AR 147. The USMC received ten capability statements in response. *Id.* Because the program manager determined that the small business respondents were unlikely to be capable of satisfying the program requirements, the USMC did not set-aside any of the prior contract for small businesses. *Id.*

On January 28, 2022, the USMC issued Sources Sought Notice No. M95494-MR22-009 (the "SSN"), "seeking information from interested organizations on capabilities in the marketplace for the performance of Program Management, Training and Support Services for the HQMC Law Enforcement Program (MCLEP)." AR 154. The SSN contained a draft Performance Work Statement (the "Draft PWS") and a draft personnel requirements matrix. *Id.* The SSN lists the NAICS code as 541611 and a size standard of $16.5 million of annual receipts. *Id.* For this procurement, the Draft PWS identifies 17 required tasks, which are: (1) Program Management; (2) MCLE Law Enforcement Subject Matter Expert (SME) Support (Program Analyst, Manpower, Human Resources and Recruiting); (3) MCLE Policy/Doctrine Support; (4) MCLE Background Investigation Support; (5) MCLE Logistics and Supply Support; (6) Credentialing and Badge Support; (7) Law Enforcement Information Systems and Information Communications Support; (8) Shareable Content Object Reference Model (SCORM); (9) Law Enforcement SME Support (Training, Assessment and Compliance); (10) PSL Administration and Staffing Support; (11) PSL Policy/Doctrine Support; (12) PSL Corrections Support; (13) MCPA Instructor and Training Support; (14) MCLE/MCPA Senior Curriculum Manager; (15) MCPA Administration Support; (16) MCPA RFI/Logistics Support; and (17) MCPA Lead Instructor Support. AR 158-78.

The USMC received five responses to the SSN. These responses came from HSSI, [ . . . ], and two small businesses participating in the Small Business Administration's Section

8(a) program.  AR 328.  At the time, HSSI was a large business.[2]  *Id.*  Both [ . . . ] and [ . . . ] are Service-Disabled Veteran Owned Small Businesses ("SDVOSBs").  *Id.*  A third SDVOSB sought information from the USMC after the deadline for responding to the SSN, and the USMC sent the Draft PWS to this third SDVOSB.  AR 326-27.

The contracting officer's representative ("COR") reviewed the five responses that the USMC received.  The contracting officer requested the COR review the responses and assess each "Respondent's potential to fulfill 50% of the tasking of the PWS."  AR 322.  The contracting officer explained that the 50% requirement was due to a prime contractor's ability to subcontract up to 50% of the work.  *Id.*  The COR provided his assessment a few days later, and there was a limited back-and-forth between him and the contracting officer.  AR 321-25.  The COR found that both [ . . . ] and [ . . . ] appeared capable of meeting the 50% threshold.  AR 324-25, 328-29.

The contracting officer concurred with the COR's assessment.  AR 324-25.  She found that four of the five respondents, including HSSI, [ . . . ], and [ . . . ], were capable of performing the contract requirements.  AR 328-29.  She, therefore, concluded that there were at least two SDVOSBs ([ . . . ] and [ . . . ]) that she deemed capable of performing the contract requirements and likely to submit competitive proposals, leading to award at a fair market price.  *Id.*  As a result, the contracting officer recommended setting aside the procurement for SDVOSBs.  The Director of the USMC's Headquarters Office of Small Business Programs concurred with the set-aside recommendation.  AR 330.  The Director of Contracts approved the acquisition strategy, including the SDVOSB set-aside.  AR 338-61.

The USMC also prepared an Independent Government Cost Estimate ("IGCE") for the expected scope of work.  AR 344.  The IGCE was [ . . . ], with an average yearly estimate of between [ . . . ].  AR 344.  The IGCE consisted of hourly rates for various labor categories using the General Services Administration's Contract Awarded Labor Categories Tool, travel and per diem costs, material and uniform costs, and other direct costs.  These amounts were based on historical data and included escalation rates during the option years.  AR 344-45.

On May 11, 2022, the USMC issued Solicitation No. M95494-22-R-0006 as a SDVOSB set-aside.  AR 453.  The "core components of this contract" are "program management support to ensure comprehensive, consistent, effective, and efficient law enforcement skills and readiness, the procurement of associated police equipment and uniforms, program management oversight, policy and doctrine support, and law enforcement training support (initial, in-service, sustainment, and advanced)."  AR 646.  The required tasks in the Draft PWS remained largely the same in the Solicitation.  *Compare* AR 158-78, *with* AR 648-69.

### C.    The FY2022 National Defense Authorization Act

Section 874 of the National Defense Authorization Act for Fiscal Year 2022, Pub. L. 117-81, 135 Stat. 1541 (2021) ("FY22 NDAA") authorizes the Secretary of Defense to authorize a pilot program through which the Department of Defense ("DoD") could award successor

---

[2] HSSI contends that if the competition is reopened, it would now qualify as a small business under the size standards of this procurement.  ECF No. 20 at 2.

contracts to contractors wholly owned by an Employee Stock Ownership Plan ("ESOP") without competition, if the ESOP had performed at least satisfactorily throughout the prior contract term. FY22 NDAA § 874(b). While the FY22 NDAA authorized the ESOP pilot program, it did not mandate it. The statute provides that "the Secretary of Defense *may* establish a pilot program to carry out the requirements of this section." *Id.* § 874(b)(1) (emphasis added). And "*[i]f* the Secretary of Defense establishes a pilot program under this section, the Secretary shall establish mechanisms to collect and analyze data on the pilot program . . . ." *Id.* § 874(d)(1) (emphasis added).

Shortly before the USMC released the Solicitation, in April 2022, HSSI requested the USMC utilize Section 874 to award a successor contract without competition. AR 408-09. In a series of communications, the USMC explained that Section 874 was not available because certain prerequisites had not been met, including the completion of a data collection and reporting strategy plan. AR 407.

## II.      Jurisdiction and Standard of Review

This Court has jurisdiction to review a pre-award bid protest under 28 U.S.C. § 1491(b)(1). In reviewing a bid protest, the Court applies the Administrative Procedure Act's ("APA") standards. *Id.* § 1491(b)(4). Under the APA review, "[t]he Court reviews the contracting officer's analysis to determine whether it was arbitrary or capricious, a standard requiring only that the action be supported by a rational basis." *Mgmt. & Training Corp. v. United States*, 118 Fed. Cl. 155, 168 (2013) (citing 28 U.S.C. § 1491(b)(4)) (additional citations omitted). It is not for this Court to determine whether the USMC's set-aside decision was one the Court would have made. Instead, there is a "zone of acceptable results in a particular case" and arbitrary and capricious review "requires only that the final decision reached by an agency be the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decision-making.'" *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 654 n.8 (2002), *aff'd*, 56 Fed. Appx. 474 (Fed. Cir. 2003) (citing *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105 (1983)) (additional citations omitted). "This standard requires us to sustain [the agency's] set-aside if it evinces rational reasoning and consideration of relevant factors." *Res-Care, Inc. v. United States*, 735 F.3d 1384, 1390 (Fed. Cir. 2013) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)). Finally, "[a] contracting officer's decision to set aside a contract for small businesses invokes 'highly deferential rational basis review.'" *Id.* (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1368-69 (Fed. Cir. 2009).

## III.      Discussion

### A.      The Rule of Two

Pursuant to the "Rule of Two," a "contracting officer shall set aside any acquisition over the simplified acquisition threshold for small business participation when there is a reasonable expectation that: (1) Offers will be obtained from at least two responsible small business concerns . . . and (2) Award will be made at fair market prices." 48 C.F.R. § 19.502–2(b). When the Rule of Two is satisfied, the Government creates "restricted competition market" for the qualifying small businesses. *Veteran Shredding, LLC v. United States*, 146 Fed. Cl. 543, 574

(2019).  A "contracting officer's determination under [48 C.F.R.] § 19.502–2 'concerns a matter of business judgment within the contracting officer's discretion that . . . will not be disturbed absent a showing that it was unreasonable.'"  *Glob. Comput. Enters., Inc. v. United States*, 88 Fed. Cl. 350, 445 (2009) (quoting *Quality Hotel Westshore; Quality Inn Busch Gardens*, B-290046, 2002 WL 1162918, at *2 (Comp. Gen. May 31, 2002)).  An agency's decision is reasonable if there is a "'rational connection between the facts and the decision made.'"  *MCS Mgmt., Inc. v. United States*, 48 Fed. Cl. 506, 516 (2000) (quoting *Crux Computer Corp. v. United States*, 24 Cl. Ct. 223, 226 (1991)).  Finally, "[t]he Rule of Two is part of a larger framework in the FAR established to benefit small businesses.  All that is required is a reasonable expectation."  *Adams & Assocs., Inc. v. United States*, 109 Fed. Cl. 340, 357 (2013), *aff'd*, 741 F.3d 102 (Fed. Cir. 2014).  Indeed, "[t]he threshold for meeting the criteria of the Rule of Two is purposefully low and is counterbalanced by FAR provisions that provide direction in the event of a failed set-aside."  *Id.*

> 1.    The contracting officer's reasonable expectation that two responsible offerors will submit offers

The first prong of the Rule of Two analysis is whether there "is a reasonable expectation that . . . [o]ffers will be obtained from at least two responsible small business concerns . . . ."  48 C.F.R. § 19.502-2(b).  HSSI acknowledges that to satisfy this prong, the contracting officer need not engage in a full responsibility determination but argues that "'the contracting officer must have a reasonable expectation that likely small business offerors will survive a future responsibility determination.'"  ECF No. 20 at 5 (quoting *Adams & Assocs.*, 741 F.3d at 111).

HSSI takes issue with the contracting officer's reliance on past market research and the review of capability statements.  According to HSSI, there could be no reasonable expectation that at least two responsible SDVOSBs would submit offers based on the information before the contracting officer.  HSSI argues that in making the SDVOSB set-aside decision, the contracting officer erroneously considered only outdated market research from 2016 and the responses to the SSN.  ECF No. 18 at 14 (quoting AR 329).

> a)    *2016 Market Research*

According to a 2016 market research report, the USMC held an Industry Day in August 2016 where it requested capability statements from interested parties.  ECF No. 18 at 14.  HSSI argues that a review of that report demonstrates that "only one capable SDVOSB responded . . . and that entity was capable only if it partnered with the incumbent, HSSI."  *Id.* at 15.  HSSI further argues that "[t]his research does not support the Agency's decision to set-aside the present requirement."  *Id.*  The record, however, does not support the conclusion that the contracting officer relied on the 2016 market research at any point in reaching her conclusion about whether two SDVOSBs would likely submit proposals in response to this procurement.

During the deliberations between the contracting officer and the COR, who was the program manager for the services the USMC was procuring, they discussed only the responses to the SSN and their capability assessment based on those responses.  AR 321-27.  There is not a single reference to the 2016 market research.  In fact, the Small Business Coordination Record memorializing the contracting officer's decision to set aside the procurement for SDVOSBs lists

only the SSN and the USMC's capability determination as "market research" for this procurement.  AR 328-29 (Box 11A).  There is no mention of anything from 2016.  Not one.  To the extent any doubt remains, the contracting officer provided a declaration regarding the harms to the Government from an injunction.  In an introductory paragraph, she explains that the market research she conducted and relied upon consisted of the SSN, the capability statements, and the USMC's evaluation of the capability statements.  ECF No. 19-1 ¶ 3.  Again, there is not a single mention of 2016 market research.  The Court will not presume the contracting officer relied on something that she neither listed as market research in her written coordination record, nor discussed with the COR when deciding whether to set aside the procurement for small business concerns, nor mentioned in her declaration to this Court.

The Small Business Coordination Record does not refer to the 2016 market research as being market research for *this* procurement.  Instead, the coordination record only mentions the 2016 market research in response to a requirement to provide the history of prior contract awards.  Specifically, the coordination record requires a brief history of predecessor contracts and whether "orders could be set aside for small business."  AR 329.  Every statement HSSI contends shows reliance on the 2016 market research appears in response to this requirement.  The entirety of the requirement and response makes this clear:

> 14C. **LIST NAME, CONTRACT NUMBER(S), CAGE CODE(S), AND DUNS OF CONTRACTOR(S) THAT RECEIVED PREVIOUS AWARD(S). INCLUDE TYPE(S) OF BUSINESSES FOR EACH CONTRACTOR** (e.g., SB, HUBZone SB, SDB, SDVOSB, EDWOSB, WOSB, other than small business)**, AND TYPE(S) OF CONTRACT.  INCLUDE PERIOD OF PERFORMANCE WITH OPTIONS, AND TOTAL CONTRACT VALUE INCLUDING ALL MODIFICATIONS AND EXERCISED OPTIONS.**  If previous contract was consolidated or bundled, list all contractors that received previous awards for any portion of this work; if previous contract was a MAC, list all previous contractors and indicate if reserves were used and *if orders could be set aside for small business*.  Attach additional pages as necessary.
>
> Homeland Security Solutions, Inc. (HSSI), a Large Business, (CAGE 3MCT8) is the incumbent, currently performing on M00264-19-C-0007; and has been providing these services since 2006.  Where this current effort is being administered out of the Quantico Regional Contracting Office; access to documentation and market research is somewhat limited.  However, the Contracting Officer was able to access the most recent Market Research performed by the RCO from 2016.  An Industry Day was held August 2016, to which 22 different organizations attended; [sic] including the incumbent.  Further, the OSBP released a Request for Information from Small Businesses interested in fulfilling the requirement; 10 Small Businesses responded with interest.  Of these 10, only four (4) were deemed capable of

> fulfilling the requirement; but due to the estimated value (~$85M),
> the OSBP recommended a Full and Open Competition, whereby it
> appeared too risky for a SB to have the financial capability to
> perform the requirement.  HSSI was subsequently awarded the
> contract on 8 February 2019 with Option periods to support
> performance through 10 March 2023.

AR 329 (bold emphasis in original, italic emphasis added).  It is abundantly clear that the USMC was not using the 2016 market research to justify a SDVOSB set-aside in this procurement. Instead, the discussion is clearly explaining why the *prior contract* was not set aside for small business concerns.

To the extent the USMC had relied on 2016 market research, that reliance would have been misplaced.  While there is no specific methodology required for a set aside determination, market research is necessary to determine whether at least two qualifying businesses are likely to submit proposals because "Agencies shall . . . [u]se the results of market research to . . . [d]etermine whether the acquisition should utilize any of the small business programs in accordance with part 19." 48 C.F.R. § 10.001(a)(3)(viii).  But market research goes stale.  Thus, "[t]he contracting officer may use market research conducted within 18 months before the award of any task or delivery order if the information is still current, accurate, and relevant."  *Id.* § 10.002(b)(1).  Suffice it to say, 2016 market research would not be probative for a procurement taking place six years later.  But this does not mean that the USMC did anything improper; it means that the reasonableness of the Rule of Two determination will rest solely on the 2022 market research.

*b)      2022 Market Research*

It is not clear from its briefing, but HSSI appears to assert that the 2016 market research was the most recent market research conducted for this procurement.  ECF No. 18 at 14.  But this assertion relies upon the language in the Small Business Coordination Report that, as explained above, explains why prior contracts were not set aside for small business concerns based on 2016 market research.  The USMC did conduct market research in 2022—it posted the SSN and Draft PWS on the SAM.gov website and received five capability statements in response, which it analyzed.  This fits squarely within the FAR's definition: "Market research means collecting and analyzing information about capabilities within the market to satisfy agency needs." 48 C.F.R. § 2.101.  This Court has often found that posting an SSN and analyzing the responses constitutes market research when making a small business set-aside determination.  *E.g.*, *Dynamic Educational Systems, Inc. v. United States*, 109 Fed. Cl. 306, 312 (2013) ("The purpose of a sources sought notice is to conduct market research regarding the businesses, specifically small businesses, that operate in a particular industry and that might be willing subsequently to compete for the work."); *Assessment & Training Solutions Consulting Corp. v. United States*, 92 Fed. Cl. 722, 730-31 (2010) (recognizing an SSN and responses to it as market research).

The question is whether the market research was sufficient.  HSSI argues that it was not for several reasons, mostly targeting one of the SDOVSBs that submitted a capability statement in response to the SSN.  Before turning to HSSI's challenges to the USMC's evaluation of [ . . . ] capability statement, it bears recognizing that the analysis here is not whether two specific

SDVOSBs are reasonably likely to submit offers but whether any two responsible SDVOSBs are reasonably likely to submit offers. *Mgmt. & Training Corp.*, 118 Fed. Cl. at 168-69 (recognizing that although the agency "identified two particular small businesses which [it] believed to be responsible and likely to submit offers, the Rule of Two only requires the agency to have a 'reasonable expectation' that it will receive at least two offers from *some* responsible small businesses, not necessarily any two specific small businesses.") (citing *Adams & Assocs.*, 109 Fed. Cl. at 355) (additional citations omitted).  Thus, even if the USMC's conclusion that [ . . . ] and [ . . . ] were reasonably likely to submit proposals was flawed, the USMC could still have had a reasonable expectation that at least two responsible offerors would submit offers.  And "whether to set aside a solicitation for small businesses is a matter of business judgment within the contracting officer's discretion." *Adams & Assocs.*, 109 Fed. Cl. at 356.  One should not "conflate[] a set-aside determination with a responsibility determination . . . the former determines whether there is a reasonable expectation that at least two responsible small businesses will make an offer at fair market prices, while the latter determines whether an individual contractor is responsible in the context of awarding a contract." *Adams & Assocs.,* 741 F.3d at 111.  Finally, the determination is not the final word.  If the USMC does not get at least two offers from responsible offerors, it is free to open the procurement to greater competition.  *Adams & Assocs.*, 109 Fed. Cl. at 357 ("If there are no acceptable offers from responsible small businesses in response to a set-aside, then FAR part 19.502–2(a) states that 'the set-aside shall be withdrawn and . . . be resolicited on an unrestricted basis.'") (alteration in original).  In other words, there is not a high bar to justify a small business set-aside, and the contracting officer enjoys significant discretion in making such a determination.  With this framework, the Court turns to HSSI's challenges to the USMC's evaluation of capability statements.

> c)      The USMC's analysis of prong one

HSSI contends that the contracting officer did not analyze the capability statements to determine whether they showed the respondents could perform the tasks set forth in the Draft PWS.  ECF No. 18 at 15.  According to HSSI, the COR, who was the MCLEP program manager, spent less than one working day analyzing the capability statements and questions how the contracting officer concluded [ . . . ] would be capable of performing based on "experience that is directly tied to some specific tasks in the PWS" when [ . . . ] did not list any "specific experience in law enforcement."  ECF No. 18 at 16 (quoting AR 325).  HSSI contends that the limited analysis here is insufficient, as shown by the detailed mapping of capability statements to specific tasks that the USMC conducted for the 2016 MCLEP procurement.  *Compare* AR 6-7 *with* AR 324-25.  But this argument fails because the USMC is not required to conduct the detailed analysis that it did in 2016.  There is no specific method required at all, so the fact that the USMC did more analysis for a prior procurement does not make the analysis here inadequate.  *E.g.*, *Analytical Graphics, Inc. v. United States*, 135 Fed. Cl. 378, 414 (2017) ("'The law does not require any particular method'" when performing a Rule of Two analysis.) (quoting *Dynamic Educational Sys.,* 109 Fed. Cl. at 326) (additional citation omitted).

There are certainly several PWS tasks that have little (if anything) to do with "law enforcement"—*e.g.*, "program management," "MCLE Background Investigation Support," "MCLE Logistics and Supply Support," "Credentialing and Badge Support," "Law Enforcement Information Systems and Information Communications Support," "MCPA Administration

Support," and "MCPA RFI/Logistics Support." AR 158-78. [ . . . ] explains its history of compliant recruiting, management, and training support services for the U.S. Government, including the USMC. AR 317. [ . . . ] also has history training personnel for the U.S. Government, including combat elements of the USMC. AR 319-20. Recognizing that [ . . . ] could perform some PWS tasks is wholly rational.[3] And here, the USMC chose to analyze capability to perform 50% of the tasks because the awardee could subcontract up to 50% of the work. AR322.

HSSI also argues that USMC could not have a reasonable expectation that [ . . . ] would submit an offer as a prime contractor because [ . . . ] capability statement shows that it responded in the context of a subcontractor. ECF No. 18 at 17. Thus, HSSI contends there could be no reasonable expectation that two SDVOSBs would submit proposals. According to HSSI, "[ . . . ] devotes considerable discussion to ways the solicitation should be structured to ensure that small business subcontractors are provided meaningful engagement . . . [and] unambiguously identifies itself as a small business. Thus, [ . . . ] is clearly submitting its capabilities as a proposed small business subcontractor." *Id.* at 17-18 (internal citation omitted). The USMC did not read [ . . . ] capability statement as proposing to perform as a subcontractor. AR 325. The USMC's understanding is reasonable based on the entirety of [ . . . ] capability statement.

The only support for HSSI's argument is that [ . . . ] stated that the USMC should structure the MCLEP contract to require at least 40% small business subcontracting. AR 316. This statement could be read to mean that [ . . . ] sought to perform as a subcontractor and wanted to ensure meaningful small business participation. It would be unusual for a small business prime contractor to seek such a large small business subcontracting plan. But [ . . . ] also made several representations that are incompatible with its seeking to perform as a subcontractor. [ . . . ] stated that it intended to perform all contract requirements: "[ . . . ]" AR 315. And [ . . . ] stated that "[ . . . ]" AR 317. [ . . . ] also explained that it [ . . . ]. AR 318. Given that it would be incompatible with being a subcontractor to rely on experience of large business partners coupled with statements that [ . . . ] intended to perform all tasks make the USMC's reading of [ . . . ] capability statement as explaining capabilities to perform as a prime contractor.

The context in which parties responded to the SSN further supports the USMC's understanding. When the USMC posted the SSN, there was no small business set-aside included or indicated. AR 150. Nor had the USMC set aside the MCLEP contracts in the past. Therefore, it was not clear whether the USMC intended to set aside any or all of the MCLEP contract for small business concerns. The plain reading of [ . . . ] capability statement, therefore, is that it sought to explain its capabilities to be a prime contractor but wanted to make clear that the USMC should include a significant small business contracting requirement if the MCLEP contract was not set aside for small businesses. The USMC's clear understanding that [ . . . ]

---

[3] The Government argues that [ . . . ] capability statement clearly shows its ability to perform specific PWS Tasks. ECF No. 19 at 18. The USMC did not attempt to map capabilities with PWS Tasks, so this Court does not consider mapping to PWS tasks. What is important for the Court is what the USMC did contemporaneously, not what the Government argues to this Court. *Analytical Graphics,* 135 Fed. Cl. at 418-19.

intended to submit a proposal as a prime contractor was rational based on the capability statement and the context in which it was received.

Finally, HSSI belatedly challenges the USMC's reasonable expectation that [ . . . ] would submit a proposal for the MCLEP contract. HSSI never argues in its motion that [ . . . ] lacked the ability to perform or that the USMC could reasonably expect [ . . . ] to submit a proposal for the MCLEP contract. In fact, HSSI mentions [ . . . ] only three times in its motion—twice in the background section and once in passing when arguing for completing the administrative record. ECF No. 18 at 5, 29. After the Government recognized this fact and stated that HSSI waived any challenge regarding [ . . . ], HSSI raised several arguments in its reply in support of its motion for judgment and response to the Government's cross-motion. ECF No. 20 at 9-13. But it is "well established that arguments not raised in the opening brief are waived." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006); *see also Novosteel SA v. United States*, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002); *Tetra Tech Amt v. Dell Servs. Fed. Gov't, Inc.*, 128 Fed. Cl. 169, 184 (2016). During argument, HSSI argued that the Government "opened the door" for these arguments when it stated in its cross-motion that HSSI conceded that there was no error relating to [ . . . ]. Not so. If it were so easy to revive an abandoned argument, there would be no case in which a party could waive an argument. HSSI waived any challenge to the USMC's expectations based on [ . . . ] capability statement and cannot use the Government's recognition of that fact to shoehorn waived arguments into this case.

Having received two capability statements from SDVOSBs that the contracting officer rationally found to be capable of performing, the USMC reasonably concluded that the first prong of the Rule of Two was satisfied.

>           d)      *The USMC's expectation that award would be at fair market price*

The second prong of the Rule of Two requires that the USMC to have a reasonable expectation that an "[a]ward will be made at fair market prices." 48 C.F.R. § 19.502-2(b). As HSSI acknowledges, "[t]his Court has explained that '[t]he most natural method of forming a reasonable expectation that an award will be made at a fair market price is to rely on the contracting officer's expectation of competitive bidding.'" ECF No. 18 at 21 (quoting *Mgmt. & Training Corp.*, 118 Fed. Cl. at 171). If competition is two or more independent entities seeking the same contract, and prong one requires a reasonable expectation that two or more responsible small businesses are likely to submit proposals, it is hard to see what prong two adds to the analysis. Here, 48 C.F.R. § 19.502-2(b)(2) provides that "past acquisition history and market research" also inform this analysis. While a price analysis is not required, the Court has found that looking to potential offerors' experience and successes in the past to inform the decision adds support to the second prong analysis. *E.g.*, *Analytical Graphics,* 135 Fed. Cl. at 420.

According to the record, the COR did recognize both [ . . . ] and [ . . . ] success in the marketplace over the years. AR 324-25. Both [ . . . ] and [ . . . ] had been successful in the marketplace for years. And this history of success in the marketplace bolsters the expectation that prices will be fair and reasonable when proposals are received and analyzed. *Analytical Graphics, Inc. v United States*, 135 Fed.378, 419 (2017). The USMC's assessment of the responses to the SSN from [ . . . ] and [ . . . ] provides sufficient support that the USMC had a reasonable expectation that at least two responsible small business concerns would submit offers

and that an award would be made at fair market value based upon competitive bidding, satisfying the Rule of Two. Therefore, the USMC's decision to set aside the solicitation solely for SDVOSBs was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

HSSI argues that the government couldn't have had reasonable expectation of competitive bidding because [ . . . ] submitted its capabilities as a subcontractor rather than a prime contractor. As explained above, the USMC reasonably interpreted [ . . . ] response as expressing an intent to submit a proposal as a prime contractor. HSSI's argument fairs no better here than it did for prong one.

HSSI next argues that past acquisition history and market research cannot support a reasonable expectation of an award at a fair market value because "HSSI has been the sole prime contractor supporting the MCLEP program since its inception" and USMC "had no comparable prior procurement history upon which to rely because it had not requested pricing information from other offerors and the previous acquisition was not of a similar magnitude to the present acquisition." ECF No. 18 at 21-22. But the USMC was not required to conduct a price evaluation at the Rule of Two stage. *E.g.*, *Adams & Assoc.*, 741 F.3d at 111. In fact, HSSI did not request any price information as part of the SSN, so it could not assess pricing at this stage.

Similarly unavailing are HSSI's challenges to the Independent Government Cost Estimate ("IGCE"). ECF No. 18 at 21-23. Again, price analysis is not necessary at the Rule of Two stage. Nor did the USMC appear to rely on the IGCE in making its Rule of Two determination. If it did, it is not clearly reflected in the record. Finally, HSSI's challenge focuses on its contention that the IGCE underestimates the likely price. For example, HSSI faults the IGCE for budgeting [ . . . ] to perform background investigations, when HSSI argues "[ . . . ] simply cannot accomplish this task." ECF No. 18 at 22. Similarly, HSSI faults the IGCE for planning [ . . . ] to perform work that HSSI contends the PWS requires 62.5 hours. ECF No. 18 at 23. And HSSI challenges the IGCE for not escalating certain costs in accord with the PWS. *Id.* Even if any of this were relevant, it is hard to imagine how it could undermine the Rule of Two analysis. The net result of HSSI's argument, if correct, is that the IGCE is *too low*. If fixing these errors, some of which the USMC has corrected, increases the IGCE, it would also increase the probability that the USMC will find SDVOSB prices fair and reasonable when the USMC performs the price analysis of proposals during the procurement. But these are not questions for the Rule of Two, they are for the price competition.

**B.     The record lacks indicia of any lack of advance planning**

HSSI challenges the USMC's setting aside the MCLEP procurement for SDVOSBs because it purportedly failed to adequately plan the procurement. ECF No. 18 at 24-26. It is beyond dispute that the Government may not award a contract other than through full and open competition because the Government failed to adequately plan for a competitive procurement. Here, the regulation is clear: "Contracting without providing for full and open competition shall not be justified on the basis of – (1) A lack of advance planning by the requiring agency." 48 C.F.R. § 6.301(c)(1). HSSI attempts to show that the USMC's set-aside is the result of inadequate planning by arguing that the USMC improperly waited until the same fiscal year as the award to begin the research for the procurement in violation of 48 C.F.R. § 7.104(a).

Case 1:22-cv-00659-EHM   Document 25   Filed 10/18/22   Page 12 of 15

Second, HSSI complains that the rushed timeline forced the USMC to change certain fixed price items to cost reimbursable, purportedly showing a rushed and unplanned procurement.

At the outset, the Court recognizes that no part of the USMC's set-aside decision is based on a lack of time to conduct a full and open procurement. More importantly, the very provision that HSSI relies upon precludes its argument. Specifically, it is "[c]ontracting without providing for full and open competition *or full and open competition after exclusion of sources*" that is prohibited unless there is an exception allowing noncompetitive contract award. 48 C.F.R. § 6.301(a) (emphasis added). The regulations governing full and open competition after exclusion of sources are in 48 C.F.R. Subpart 6.2. Among these are the provisions governing set-asides for SDVOSBs. 48 C.F.R. § 6.206. Under the plain terms of the regulations, a procurement set aside for SDVOSBs is not a noncompetitive procurement, it is a "full and open competition after exclusion of sources." And competition must be used. 48 C.F.R. § 6.201 ("Acquisitions made under this subpart require use of the competitive procedures prescribed in [48 C.F.R. §] 6.102."). Thus, 48 C.F.R. § 6.301(c) is irrelevant to this procurement because the USMC is providing full and open competition after exclusion of sources.

Even if § 6.301(c) did apply, HSSI's argument about changing certain line items from fixed price to cost reimbursable would fair no better. As an initial matter, the USMC may procure service however it chooses so long as it complies with the law and follows whatever solicitation it publishes. HSSI does not get to impose its preferences on the USMC. Here, the contracting officer chose to change certain travel-related line items to cost reimbursable to save the USMC money because of the impact of COVID-19. Specifically, the contracting officer recognized that COVID-19 caused the amount of travel to fall significantly, meaning that a fixed price for travel items would not be advantageous to the USMC. Instead, she concluded that "the best approach to funding Travel for this requirement would be to issue it on a Cost Reimbursement basis" and to require pre-approval of all travel. AR 367. There is nothing in the record indicating that this conclusion was anything other than rational, and it has nothing at all to do with the timing of the procurement.

### C.    No Section 874 pilot program is available for this procurement

HSSI argues that it was unlawful for the USMC to refuse to award this contract as a sole-source, follow-on to a qualified employee stock-owned corporation ("ESOP") in accordance with Section 874 of the FY22 NDAA. ECF No. 18 at 26. According to HSSI, the FY22 NDAA required the DoD to comply with Section 874 by completing its data collection and reporting strategy regarding ESOPs and to submit this plan and strategy to the congressional defense committees in accordance with Section 874(d). *Id.* at 27. HSSI insists that although the plain text of Section 874 did not require DoD to implement Section 874, the record shows that DoD likely exercised its discretion by choosing to implement Section 874. Therefore, the USMC unreasonably delayed the implementation of Section 874 in the instant procurement. ECF No. 20 at 18-19.

Section 874 does not mandate that the DoD implement the pilot program. "The Secretary of Defense *may* establish a pilot program to carry out the requirements of this section." FY22 NDAA § 874(b)(1) (emphasis added). It is only "*if* the Secretary of Defense establishes a pilot program under this section, the Secretary shall establish mechanisms to collect and analyze data

on the pilot program . . . ." *Id.* § 874(d)(1) (emphasis added).  It is not clear from the record if the Secretary of Defense has elected to implement the ESOP pilot program, but if he has not, the decision not to do so does not violate the statute.

Even if Section 874 was mandatory or the Secretary of Defense has chosen to establish the pilot program, the statute explicitly prohibits using the pilot program in this case because DoD has not completed the statutory pre-requisites to the pilot program's implementation. Section 874(d)(2) provides that "[t]he Secretary of Defense *may not* carry out the pilot program under this section before (A) completing a data collection and reporting strategy and plan to meet the requirements of this subsection; and (B) submitting the strategy and plan to the congressional defense committees." *Id.* § 874(d)(2) (emphasis added).  It is undisputed that DoD has not completed these requirements.  Relying on *Telecommunications Research and Action Center v. Federal Communications Commission*, 750 F.2d 70 (D.C. Cir. 1984) ("TRAC"), HSSI contends that the DoD has unreasonably delayed its implementation of Section 874 because it had not implemented the ESOP pilot program "[r]oughly six months after it was enacted."  ECF No. 20 at 19.  The Court does not agree that the fact DoD (not the USMC) had not implemented the (optional) pilot program within six months amounts to unreasonable delay.  Indeed, *TRAC* is readily distinguishable because there the claim was for overpayment by consumers that the FCC had not acted on in nearly five years.  *TRAC*, 750 F.2d at 73 (stating the petition at issue was filed in 1979, and the case was before the D.C. Circuit in 1984).  Assuming DoD has chosen to implement the pilot program, a fact not clearly established in the record, the Court cannot agree that the fact that DoD has not fully implemented the pilot program in six months is unreasonable.

Because a noncompetitive award under Section 874 is not available in this case, the USMC's refusing to award such a contract is not arbitrary, capricious, or otherwise not in compliance with the law.  To the contrary, the USMC complied with the law, which is antithetical to arbitrary and capricious decision-making.  Section 874 provides no basis to disturb the procurement.

### D.     Injunctive Relief

When considering whether to grant injunctive relief under 28 U.S.C. § 1491(b)(2), the Court must consider whether "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief."  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citation omitted).  But "[a]bsent success on the merits, the other factors are irrelevant." *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003).  Because HSSI fails on the merits, the Court declines to award injunctive relief.

## IV.    HSSI's Motion to complete the administrative record

As part of its MJAR,[4] HSSI moves to complete the record with documents it claims are missing. ECF No. 18 at 28-31. A motion to complete the record "seeks to add 'information that was generated and considered by the agency' during the procurement but was omitted from the record filed with this Court." *Insight Pub. Sector, Inc. v. United States*, 157 Fed. Cl. 398, 406 (2021) (quoting *Smith v. United States*, 114 Fed. Cl. 691, 695 (2014), *aff'd,* 611 F. App'x 1000 (Fed. Cir. 2015)). HSSI argues that the record filed in this Court does not include certain documents sent as email attachments that the contracting officer and the COR considered when they were assessing the responses to the SSN.

On February 7, 2022, the COR sent the contracting officer the sources sought matrix assessing each of the responses to the SSN. AR 322. The contracting officer sent a revision back to the COR on February 8, 2022, with some questions included. AR 321-22. Also on February 8, 2022, the COR sent a revision of the sources sought matrix to the contracting officer. *Id*. None of these documents are in the record, although the transmitting emails are. And the final matrix is in the record as well.

HSSI and the Government argue competing doctrines. According to HSSI, because these documents were considered, they must be in the record under cases like *Poplar Point RBBR, LLC v. United States*, 145 Fed. Cl. 489 (2019), and *Arkray USA, Inc. v. United States*, No. 14-233C, 2014 WL 2905127 (Fed. Cl. Apr. 28, 2014). The Government contends that the documents that HSSI seeks are drafts of the sources sought matrix, the final version of which appears in the record at AR 324-25. ECF No. 19 at 26. Therefore, the Government relies on the numerous cases that hold that drafts of a document are properly omitted from the record, including *Gulf Group, Inc. v. United States*, 61 Fed. Cl. 338 (2004), and *Lyon Shipyard, Inc. v. United States*, 113 Fed. Cl. 347 (2013).

Because the omitted documents here are drafts of the final sources sought matrix, the Court agrees with the Government that the record here is complete with the final version of the matrix. When the final version of a document is in the record, the Court generally does not require the inclusion in the record of drafts of that document. *E.g.*, *Gulf Group*, 61 Fed. Cl. at 347 (explaining denial of discovery into draft documents). None of the cases HSSI relies upon deal with draft documents or compel the inclusion of them when the final version of the documents sought are in the record. And to the extent there were questions submitted to the COR about the matrix and his responses to the contracting officer, such communications are similarly properly excluded from the record in this case. *See, e.g., Poplar Point*, 145 Fed. Cl. at 495 (denying motion to complete the administrative record because the draft documents added nothing to what was in the record); *Oracle America, Inc. v. United States*, 146 Fed. Cl. 606, 607 (2019) (denying motion to complete the record with drafts of a final decision or contracting officer's notes).

This Court has called for additional documentation to be included in the record when the protest alleges bias by the government decisionmakers. *E.g.*, *Pitney Bowes Gov't Sols., Inc. v. United States*, 93 Fed. Cl. 327 (2010). Here, the only thing that HSSI points to is a statement from the contracting officer to the COR that "I'm going to move out with a recommendation that

---

[4] The record in this case is not large; it is only 785 pages. HSSI does not explain why it waited three weeks after getting the record to raise this issue for the first time in its MJAR briefing.

we work this acquisition as a set-aside for SDVOSBs.  As such, HSSI will be ineligible to compete for the follow-on." AR 321.  HSSI seizes on this statement to show bias because there were other non-SDVOSBs that the contracting officer did not mention.  Thus, HSSI concludes that the contracting officer was seeking to exclude HSSI from competition.  The contracting officer's statement, however, does not reflect bias on this record.  While it is true that there were other non-SDVOSBs that could not compete, none of them were the incumbent.  Simply recognizing that the incumbent would not be allowed to compete under a set-aside it does not qualify for does not reflect a bias.

CONCLUSION

For the reasons stated above, the Court:

1. Denies HSSI's motion for judgment on the administrative record, to complete the administrative record, and for permanent injunctive relief, ECF No. 18;

2. Grants the United States' cross-motion for judgment on the administrative record, ECF No. 19; and

3. Directs the Clerk to enter judgment accordingly.

IT IS SO ORDERED.

s/ Edward H. Meyers<br>Edward H. Meyers<br>Judge